IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 2:20-cr-383 |
| | ) (18 U.S.C. § 1956(h)) |
| MAKSIM BOIKO | ) |
| | ) |

## INFORMATION

The United States Attorney charges:

### COUNT ONE
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1. From in and around 2016, and continuing thereafter to in and around October 2019, in the Western District of Pennsylvania and elsewhere, the defendant, MAKSIM BOIKO, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A); that is, to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity; to wit, computer fraud in violation of Title 18, United States Code, Section 1030; wire fraud in violation of Title 18, United States Code, Section 1343; and bank fraud in violation of Title 18, United States Code, Section 1344.

### Manner and Means of the Conspiracy

2. During all times relevant to the Information, the manner and means used to accomplish the conspiracy included the following:

   a. During the charged time frame, a transnational organized crime network known as "QQAAZZ" provided money laundering services to significant cybercriminal

organizations that stole money from unwitting victims and their respective financial institutions in the United States and abroad.

  b. In order to receive and launder stolen funds, QQAAZZ members opened and maintained hundreds of bank accounts at financial institutions in numerous countries, including Portugal, Spain, Germany, Turkey, the United Kingdom, Belgium and the Netherlands.

  c. The foreign bank accounts opened by QQAAZZ members included both personal accounts as well as corporate accounts opened in the names of shell companies that conducted no legitimate business.

  d. QQAAZZ members at times used aliases and false identification documents, and at other times used their true identities, to register the shell companies and open the foreign bank accounts.

  e. Victims included both businesses and individuals. Some of the victims in the United States held bank accounts at financial institutions headquartered in the Western District of Pennsylvania.

  f. In order to attract business from cybercriminals, QQAAZZ members advertised the group's services on exclusive, Russian-language online cybercriminal forums.

  g. QQAAZZ members communicated with their criminal clients on these forums and over Jabber, a secure online instant message software.

  h. QQAAZZ provided cybercriminals with account information for specific foreign bank accounts controlled by QQAAZZ, which were designated to receive funds stolen by the cybercriminals.

  i. After receiving account information from QQAAZZ, cybercriminals would attempt to initiate an electronic funds transfer from the victim's bank accounts to the recipient account provided by QQAAZZ.

j. If the electronic funds transfer was successful, QQAAZZ "cashed-out" (that is, withdrew) the funds and transferred the funds either to a different QQAAZZ-controlled bank account or to "tumbling" services where the funds were converted to cryptocurrency through a series of transactions designed to obfuscate the original source of the funds.

k. QQAAZZ used personal bank accounts opened by money mules to receive funds transferred from original accounts in order to more easily convert the funds into cryptocurrency.

l. QQAAZZ returned a portion of the laundered funds to the cybercriminals and kept a portion for the group as a fee, which was typically between 40 to 50 percent of the total amount of the stolen funds.

3. On various occasions during the charged time frame, Defendant MAKSIM BOIKO, a citizen of Russia, did knowingly assist QQAAZZ members in furtherance of the money laundering scheme in a variety of ways, including but not limited to the following:

a. In and around 2016, MAKSIM BOIKO provided a QQAAZZ member with a foreign bank account controlled by MAKSIM BOIKO for the purpose of receiving stolen funds;

b. In and around October 2017, MAKSIM BOIKO assisted a QQAAZZ member with the successful transfer of approximately $45,000 to a cryptocurrency exchanger that catered to cybercriminals;

c. In and around May 2019, in an effort to convince law enforcement to release a large sum of British currency (*i.e.*, stolen victim funds) seized from QQAAZZ members during a border crossing, MAKSIM BOIKO provided a QQAAZZ member with a document designed to make it appear as though the stolen funds had come from a legitimate source.

        d.      In and around July 2019, MAKSIM BOIKO converted funds to cryptocurrency for a QQAAZZ member by sending 3.482 Bitcoin, approximately $35,000 at the time of the transaction, to a Bitcoin wallet controlled by the QQAAZZ member.

All in violation of Title 18, United States Code, Section 1956(h).

## Forfeiture Allegation

1. The allegations within this Information are re-alleged and by this reference fully incorporated herein for the purpose of alleging criminal forfeiture to the United States of America of certain property in which MAKSIM BOIKO has an interest.

2. As a result of committing the money laundering offense alleged in Count One of this Information, MAKSIM BOIKO shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property, including but not limited to the following:

    a. One white iPhone bearing IMIE: 359257063377678;

    b. One black iPhone bearing serial number: DNPVMNVJJCL8; and

    c. One Apple laptop computer bearing serial number C02W19XPHV2L.

## Substitute Assets

3. If any of the above-described forfeitable property, as a result of any act or omission of MAKSIM BOIKO:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third person;
    c. has been placed beyond the jurisdiction of the Court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of MAKSIM BOIKO up to the value of the above-described forfeitable property.

All pursuant to Title 18, United States Code, Section 982(a)(1).

*[signature]*

SCOTT W. BRADY
United States Attorney
PA ID No. 88352